ALYSSA J. WU (CA Bar No. 339651)
SHINING J. HSU (CA Bar No. 317917)
Federal Trade Commission
90 Seventh St., Suite 14-300
San Francisco, CA 94103
Phone: (202) 509-4758
Email: awu1@ftc.gov

JOSHUA A. DOAN (DC Bar No. 490879)
Federal Trade Commission
600 Pennsylvania Ave., NW, GAO-5K21
Washington, DC 20580
Phone: (202) 326-3187
Email: jdoan@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>GM UNIVERSEAPPS LTD., also d/b/a UNIVERSE GROUP, a Cyprus limited company;<br><br>KOFLIMIN LTD., a Cyprus limited company;<br><br>GROWTHMIND LABS LTD., a Delaware corporation;<br><br>LOPOFIST LTD., a Cyprus limited company;<br><br>GURUDOCS LTD., a Delaware corporation;<br><br>BRAMOL LTD., a Cyprus limited company;<br><br>VPN MOBAPPS LTD., a Cyprus limited company;<br><br>EVERTECH INC., a Delaware corporation;<br><br>OBRIO LTD., a Cyprus limited company;<br><br>GM UNICORN CORPORATION LTD., a Cyprus limited company; | **Case No. 26-cv-5232**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

SPIRITUAL NEBULA LTD., a Cyprus limited company;

YOLO BROTHERS INC., a Delaware corporation;

AMOMEDIA LTD., also d/b/a AMO, a Cyprus limited company;

AMOAPPS LTD., a Cyprus limited company;

AMOAPP INC., a Delaware corporation;

VLADIMIR MNOGOLETNY (aka VLADIMIR MNOGOLETNIY and VOLODYMYR MNOHOLIETNII), individually and as an owner and officer of GENESIS TECH;

VASILY ULIANOV (aka VASILIY ULYANOV and VASILI ULYANOV), individually and as an owner and officer of GENESIS TECH;

STAMATIS SKIANIS, individually and as an officer of UNIVERSE GROUP, KOFLIMIN LTD., LOPOFIST LTD., BRAMOL LTD., VPN MOBAPPS LTD., OBRIO LTD., GM UNICORN CORPORATION LTD., SPIRITUAL NEBULA LTD., AMOMEDIA LTD., and AMOAPPS LTD.;

OKSANA KUCHER, individually and as an owner and officer of GROWTHMIND LABS LTD.;

IRYNA OLEKSYN, individually and as an owner and officer of GURUDOCS LTD.;

OLGA GARBUZENKO, individually and as an owner and officer of EVERTECH INC.;

ROSTYSLAV IVANITSA, individually and as an owner and officer of YOLO BROTHERS INC.; and

VIKTORIIA SAVCHUK, individually and as an owner and officer of AMOAPP INC.,

     Defendants.

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1. The FTC brings this action for Defendants' violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401–8405. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404.

## SUMMARY OF THE CASE

2. Since at least 2020, Defendants Vladimir Mnogoletny and Vasily Ulianov, operating through a company doing business as Genesis Tech, have built and run a broad portfolio of misleading internet-based subscription schemes. These programs deceive consumers with supposedly free trials or low-cost offers while hiding the true cost and recurring nature of charges. Defendants exacerbate their illegal tactics and the consumer harm they cause by imposing unreasonable and difficult obstacles to cancellation.

3. Publicly, Genesis Tech bills itself as "an ecosystem of product IT companies," and as the "co-founder" of numerous Central and Eastern European technology startups. In practice, Genesis Tech provides its subsidiaries with tools and techniques—a consistent blueprint—to market deceptive subscriptions to consumers and bill consumers without their authorization.

4. Until January 2026, Genesis Tech was a d/b/a name of Matar Trade & Invest Limited, a British Virgin Islands limited company. Matar was dissolved on January 23, 2026, after a voluntary liquidation, but Genesis Tech remains an ongoing concern. Genesis Tech currently counts 13 businesses within its "ecosystem," and previously incubated seven additional businesses that have since transitioned into independently managed partner companies. Among its active portfolio, Genesis Tech lists Defendants Universe Group, Obrio, and AMO, but its operation includes many additional products (and associated entities).[1] Altogether, Genesis Tech has launched dozens of products that, according to Genesis Tech, have reached over one billion users worldwide. Many of the businesses in the Genesis Tech portfolio follow a common pattern

---

[1] *See* Attachment A for a diagram of Genesis Tech's enterprise.

of misconduct, including fraudulent or deceptive subscriptions, which has generated widespread consumer complaints.

5. Genesis Tech operates as a common enterprise through a sprawling network of entities it controls, including a series of subsidiaries incorporated in Cyprus and operating in Ukraine. The Cyprus subsidiaries market to U.S. consumers and access U.S. payment processing through counterparts incorporated in Delaware. Each Delaware subsidiary is led by an individual residing in the United States.

6. To further their schemes, Defendants work together to continually launch new deceptive product offerings, register new corporate identities, and open new merchant accounts. Defendants channel their ill-gotten gains through cross-border transfers among corporate affiliates, thereby concealing Defendants' true identities from consumers and hiding assets.

7. Defendants have defrauded consumers worldwide out of hundreds of millions of dollars, processing the majority of their transactions through a group of connected PayPal accounts. For example, in the 12 months ending in September 2025, the total payment volume of Genesis Tech's linked PayPal accounts approached $700 million.

8. Defendants have created and distributed dozens of varying products. Irrespective of the product, however, Defendants' playbook is consistent. Across dozens of brands, Defendants advertise personalized services for a low, one-time cost. In reality, Defendants' products lack personalization and fail to perform as advertised. In addition, Defendants impose substantial and recurring subscription charges on consumers. Defendants obscure auto-renewal terms, hide pricing information, and make cancellation difficult or impossible.

9. Genesis Tech's enterprise deploying deceptive subscriptions reaches far beyond the entities and products identified in this Complaint. Because of the opaque and evolving nature of the scheme, this Complaint focuses on five illustrative product lines: Wisey (ADHD/productivity self-help courses); PDF Guru and PDF Master (PDF editing tools, collectively "the PDF Products"); Lumi (fashion consulting); Nebula (horoscope readings and psychic chats); and MadMuscles, Harna, and Unimeal (fitness and nutrition apps, collectively the

"Amo Products"). From early 2023 to mid-2025, these five products accounted for nearly a quarter billion dollars in global revenue.

10. The FTC brings this action under Section 5 of the FTC Act and ROSCA to halt Defendants' unlawful practices, obtain permanent injunctive relief, and secure a monetary judgment and other relief.

## JURISDICTION

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

## VENUE

12. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

## DIVISIONAL ASSIGNMENT

13. Pursuant to Rule 3-2 of the Civil Local Rules of the Northern District of California, assignment to the San Francisco Division or the Oakland Division is proper because a substantial part of the events giving rise to the claims occurred in San Francisco County and Marin County. *See* Civ. L.R. 3-2(c)–(d). Defendants have advertised and sold their products to numerous consumers who reside in San Francisco County, and Defendant Rostyslav Ivanitsa is a resident of Marin County.

## PLAINTIFF

14. The FTC is an agency of the United States Government created by statute. 15 U.S.C. §§ 41–58.

15. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

16. The FTC also enforces ROSCA, 15 U.S.C. §§ 8401–8405, which prohibits merchants from selling goods or services on the Internet through negative option marketing without meeting certain requirements to protect consumers. A negative option is an offer in which the seller treats a consumer's silence as consent to be charged for goods or services. 16 C.F.R. 310.2(w).

## DEFENDANTS

17. **Vladimir Mnogoletny** (also known as Vladimir Mnogoletniy and Volodymyr Mnoholietnii) is a citizen of Romania and resident of the United Arab Emirates. Along with Defendant Ulianov, Defendant Mnogoletny is a co-founder and co-CEO of Genesis Tech. Defendant Mnogoletny is also a co-owner of Arbor Mundi Limited,[2] a British Virgin Islands limited company and the ultimate parent of Defendants Universe Group, Koflimin Limited, Lopofist Limited, Bramol Limited, VPN MobApps Limited, GM Unicorn Corporation Limited, Obrio Limited, Spiritual Nebula Limited, AMO, and Amoapps Limited (collectively, "Cyprus Corporate Defendants"), as well as Defendant AmoApp Inc. At all times material to this Complaint, acting alone or in concert with others, Defendant Mnogoletny has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Genesis Tech and Cyprus Corporate Defendants, including the acts and practices described in this Complaint. Through Genesis Tech, Arbor Mundi, and their subsidiaries, Defendant Mnogoletny has exercised ownership and control over, and benefited from, Wisey, the PDF Products, Lumi, Nebula, and the Amo Apps. In connection with the matters alleged herein, Defendant Mnogoletny transacts or has transacted business in this District and throughout the United States.

18. **Vasily Ulianov** (also known as Vasiliy Ulyanov and Vasili Ulyanov) is a citizen of Romania and resident of the United Arab Emirates. Along with Defendant Mnogoletny, Defendant Ulianov is a co-founder and co-CEO of Genesis Tech and co-owner of Arbor Mundi. At all times material to this Complaint, acting alone or in concert with others, Defendant Ulianov has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Genesis Tech and Cyprus Corporate Defendants, including the acts and practices described in this Complaint. Through Genesis Tech, Arbor Mundi, and their subsidiaries, Defendant Ulianov has exercised ownership and control over, and benefited from, Wisey, the PDF Products, Lumi, Nebula, and the Amo Apps. Defendant Ulianov is also the majority shareholder of the payment services provider for each of Defendants' merchant accounts. In

---

[2] Arbor Mundi is not named as a defendant in this Complaint.

connection with the matters alleged herein, Defendant Ulianov transacts or has transacted business in this District and throughout the United States.

19. **Stamatis Skianis** is a citizen and resident of Cyprus. Defendant Skianis serves as director of all Cyprus Corporate Defendants and as secretary of Defendants Bramol Limited, Lopofist Limited, and Spiritual Nebula Limited. Defendant Skianis also serves as director and/or secretary of over 100 other companies registered in Cyprus, many of which are related to Genesis Tech. At all times material to this Complaint, acting alone or in concert with others, Defendant Skianis has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Cyprus Corporate Defendants, including the acts and practices described in this Complaint. Defendant Skianis manages corporate governance and merchant account relationships for Cyprus Corporate Defendants. Defendant Skianis's signature appears on many of Cyprus Corporate Defendants' contracts and merchant account applications, and he is identified as the "primary user" and point of contact for several of Cyprus Corporate Defendants' merchant accounts, communicating with PayPal, for example, to appeal account limitations. In connection with the matters alleged herein, Defendant Skianis transacts or has transacted business in this District and throughout the United States.

20. GM Universeapps Limited, also doing business as **Universe Group**, is a Cyprus limited company with its registered address at Stavrou 26, Strovolos 2034, Nicosia, Cyprus, and principal place of business at 4 Profesora Pavlovskoho Street, Kyiv, Ukraine. On its website, Genesis Tech currently lists Universe Group among its active portfolio of businesses. Universe Group is the sole shareholder of Defendants Koflimin Limited, Lopofist Limited, Bramol Limited, and VPN MobApps Limited. At all times material to this Complaint, acting alone or in concert with others, Universe Group purposely directed its activities to the United States by advertising, marketing, and distributing negative option offerings, including Wisey, the PDF Products, and Lumi, to consumers in this District and throughout the United States.

### A. Wisey Defendants

21. **Koflimin Limited** is a Cyprus limited company with its registered address at Stavrou 26, Strovolos 2034, Nicosia, Cyprus. Koflimin is a wholly owned subsidiary of Universe

Group. At all times material to this Complaint, acting alone or in concert with others, Universe Group purposely directed its activities to the United States by advertising, marketing, and distributing negative option offerings, including Wisey, intended for use by consumers in this District and throughout the United States.

22. **Growthmind Labs Limited** is a Delaware corporation with its registered address at 3500 S. Dupont Highway, Dover, Delaware 19901, and principal place of business at 9205 West Russell Road, Ste. 240, Las Vegas, Nevada 89148. Growthmind Labs has advertised, marketed, and sold negative option offerings, including Wisey, to consumers throughout the United States. Defendants have used Growthmind Labs to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these debits are processed, and to distribute the sales proceeds throughout Defendants' enterprise.

23. **Oksana Kucher** is a resident of Avon, Connecticut. Defendant Kucher is the owner and sole shareholder of Growthmind Labs. At all times material to this Complaint, acting alone or in concert with others, Defendant Kucher has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Growthmind Labs, including the acts and practices described in this Complaint. Defendant Kucher is the signatory on merchant account applications for Wisey, and Growthmind Labs's financial statements and tax forms are addressed to her. In connection with the matters alleged herein, Defendant Kucher transacts or has transacted business in this District and throughout the United States.

### B. PDF Defendants

24. **Lopofist Limited** is a Cyprus limited company with its registered address at Stavrou 26, Strovolos 2034, Nicosia, Cyprus. Lopofist is a wholly owned subsidiary of Universe Group. At all times material to this Complaint, acting alone or in concert with others, Lopofist purposely directed its activities to the United States by advertising, marketing, and distributing negative option offerings, including the PDF Products, intended for use by consumers throughout the United States.

25. **Gurudocs Limited** is a Delaware corporation with its registered address at 3500 S. Dupont Highway, Dover, Delaware 19901, and principal place of business at 9205 West Russell Road, Ste. 240, Las Vegas, Nevada 89148. Gurudocs has advertised, marketed, and sold negative option offerings, including PDF Guru and PDF Master, to consumers throughout the United States. Defendants have used Gurudocs to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these debits are processed, and to distribute the sales proceeds throughout Defendants' enterprise.

26. **Iryna Oleksyn** is a resident of Aurora, Colorado. Defendant Oleksyn is the director and sole shareholder of Gurudocs. At all times material to this Complaint, acting alone or in concert with others, Defendant Oleksyn has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Gurudocs, including the acts and practices described in this Complaint. Defendant Oleksyn is the signatory on merchant account applications for the PDF Products, and her name appears on Gurudocs's financial statements and tax forms. In connection with the matters alleged herein, Defendant Oleksyn transacts or has transacted business in this District and throughout the United States.

### C. Lumi Defendants

27. **Bramol Limited** is a Cyprus limited company with its registered address at Stavrou 26, Strovolos 2034, Nicosia, Cyprus, and principal place of business at 12 Prometheus Street, Office 301, Nicosia 1065, Cyprus. Bramol is a wholly owned subsidiary of Universe Group. Bramol is listed as the developer of the Lumi app in the Apple App Store. At all times material to this Complaint, acting alone or in concert with others, Bramol purposely directed its activities to the United States by advertising, marketing, and distributing negative option offerings, including Lumi, intended for use by consumers in this District and throughout the United States.

28. **VPN MobApps Limited** is a Cyprus limited company with its registered address at Stavrou 26, Strovolos 2034, Nicosia, Cyprus. VPN MobApps is a wholly owned subsidiary of Universe Group. At all times material to this Complaint, acting alone or in concert with others, VPN MobApps purposely directed its activities to the United States by advertising, marketing,

and distributing negative option offerings, including Lumi, intended for use by consumers in this District and throughout the United States.

29. **Evertech Inc.** is a Delaware corporation with its registered address at 3500 S. Dupont Highway, Dover, Delaware 19901, and principal place of business at 7251 West Lake Mead Boulevard, Ste. 300, Las Vegas, Nevada 89128. Evertech has advertised, marketed, and sold negative option offerings, including Lumi, to consumers throughout the United States. Defendants have used Evertech to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these debits are processed, and to distribute the sales proceeds throughout Defendants' enterprise.

30. **Olga Garbuzenko** is a resident of Skillman, New Jersey. Defendant Garbuzenko is the director and sole shareholder of Evertech. At all times material to this Complaint, acting alone or in concert with others, Defendant Garbuzenko has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Evertech, including the acts and practices described in this Complaint. Defendant Garbuzenko is the signatory on merchant account applications for each of Lumi's domains. Evertech's financial statements are addressed to Defendant Garbuzenko, and Evertech's Chase and Bank of America accounts use her home address for the business. Defendant Garbuzenko also serves as the point of contact for Lumi's merchant accounts and responds to communications from payment processors, including notices regarding high chargeback rates. In connection with the matters alleged herein, Defendant Garbuzenko transacts or has transacted business in this District and throughout the United States.

### D. Nebula Defendants

31. **Obrio Limited** is a Cyprus limited company with its registered address at Athalassas 62, Mezzanine, Strovolos 2012, Nicosia, Cyprus. Genesis Tech currently lists Obrio among its active portfolio of businesses. Obrio is listed as the developer of the Nebula app in the Apple App Store and Google Play. At all times material to this Complaint, acting alone or in concert with others, Obrio purposely directed its activities to the United States by advertising, marketing, and distributing negative option offerings, including Nebula, intended for use by consumers in this District and throughout the United States.

32. **GM Unicorn Corporation Limited** is a Cyprus limited company with its registered address at 46 Lycabettus Street, Engomi 2401, Nicosia, Cyprus, and principal place of business at Athalassas 62, Mezzanine, Strovolos 2012, Nicosia, Cyprus. GM Unicorn is a subsidiary of Genesis Tech. At all times material to this Complaint, acting alone or in concert with others, GM Unicorn purposely directed its activities to the United States by advertising, marketing, and distributing negative option offerings, including Nebula, intended for use by consumers in this District and throughout the United States.

33. **Spiritual Nebula Limited** is a Cyprus limited company with its registered address at Athalassas 62, Mezzanine, Strovolos 2012, Nicosia, Cyprus. Spiritual Nebula is a subsidiary of Arbor Mundi. At all times material to this Complaint, acting alone or in concert with others, Spiritual Nebula purposely directed its activities to the United States by advertising, marketing, and distributing negative option offerings, including Nebula, intended for use by consumers in this District and throughout the United States.

34. **Yolo Brothers Inc.** is a Delaware corporation with its registered address at 3500 S. Dupont Highway, Dover, Delaware 19901, and principal place of business at 500 North Rainbow Boulevard, Ste. 300, Las Vegas, Nevada 89107. Yolo Brothers has advertised, marketed, and sold negative option offerings, including Nebula, to consumers throughout the United States. Defendants have used Yolo Brothers to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these debits are processed, and to distribute the sales proceeds throughout Defendants' enterprise.

35. **Rostyslav Ivanitsa** is a resident of Sausalito, California. Defendant Ivanitsa is the director, chairman of the board, CEO, president, and sole shareholder of Yolo Brothers. At all times material to this Complaint, acting alone or in concert with others, Defendant Ivanitsa has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Yolo Brothers, including the acts and practices described in this Complaint. Defendant Ivanitsa is the signatory on merchant account applications for each of Nebula's domains. Defendant Ivanitsa also serves as the point of contact for the Yolo Brothers PayPal

account. In that capacity, Defendant Ivanitsa received and responded to notices from PayPal related to account limitations resulting from excessive disputed charges. Defendant Ivanitsa resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

### E. Amo Defendants

36. **AmoMedia Limited**, also doing business as **AMO**, is a Cyprus limited company with its registered address at Georgiou Christoforou 8, 1st Floor, Strovolos 2012, Nicosia, Cyprus. AMO is the sole shareholder of Defendant Amoapps Limited and the ultimate parent of Defendant AmoApp Inc. Genesis Tech currently lists AMO among its active portfolio of businesses. At all times material to this Complaint, acting alone or in concert with others, AMO purposely directed its activities to the United States by advertising, marketing, and distributing negative option offerings, including the Amo Products, intended for use by consumers in this District and throughout the United States.

37. **Amoapps Limited** is a Cyprus limited company with its registered address at Georgiou Christoforou 8, 1st Floor, Strovolos 2012, Nicosia, Cyprus. Amoapps is a wholly owned subsidiary of AMO and the sole shareholder of Defendant AmoApp Inc. Amoapps is listed as the developer of the Amo Products apps in the Apple App Store and Google Play. At all times material to this Complaint, acting alone or in concert with others, Amoapps purposely directed its activities to the United States by advertising, marketing, and distributing negative option offerings, including the Amo Products, intended for use by consumers in this District and throughout the United States.

38. **AmoApp Inc.** is a Delaware corporation with its registered address at 3500 S. Dupont Highway, Dover, Delaware 19901, and principal place of business at 3753 Howard Hughes Parkway, Ste. 200, Las Vegas, Nevada 89169. AmoApp has advertised, marketed, and sold negative option offerings, including the Amo Products, to consumers throughout the United States. Defendants have used AmoApp to sell products to U.S.-based consumers, to debit U.S. consumers' credit cards and financial accounts, to open merchant accounts through which these debits are processed, and to distribute the sales proceeds throughout Defendants' enterprise.

39. **Viktoriia Savchuk** is a resident of Oak Harbor, Washington. Defendant Savchuk is a shareholder and the director, chairman of the board, president, and CEO of AmoApp. At all times material to this Complaint, acting alone or in concert with others, Defendant Savchuk has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of AmoApp, including the acts and practices described in this Complaint. Defendant Savchuk is the signatory on merchant account applications for the Amo Products. In connection with the matters alleged herein, Defendant Savchuk transacts or has transacted business in this District and throughout the United States.

### F. Common Enterprise

40. The Cyprus Corporate Defendants, Growthmind Labs, Gurudocs, Evertech, Yolo Brothers, and AmoApp (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of the law alleged below. They have conducted the business practices described below through an international network of dozens of shell companies that have common ownership, officers, managers, business functions and practices, and office locations. The companies regularly transfer funds among their corporate bank accounts, ultimately moving money overseas.

41. Because Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

42. Defendants Mnogoletny, Ulianov, Skianis, Kucher, Oleksyn, Garbuzenko, Ivanitsa, and Savchuk (collectively, "Individual Defendants") have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise. The Individual Defendants each had knowledge of the unlawful acts and practices of the Corporate Defendants that constitute the common enterprise.

### COMMERCE

43. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

44. Defendants operate an enterprise of deceptive internet--based subscriptions that maximize unauthorized charges to consumers. To sell their products, including Wisey, the PDF Products, Lumi, Nebula, and the Amo Products, Defendants repeat the same general playbook.

45. *First*, Defendants advertise "personalized" products for free or a low, one-time cost, often with a money-back guarantee. In reality, to the extent they are usable at all, Defendants' products are not personalized and automatically convert into costly recurring subscriptions.

46. *Second*, Defendants' ads direct consumers to websites that engage consumers in a task. This initial engagement creates more incentive for users to continue, so as not to lose the effort already expended. For example, Wisey, Nebula, Lumi, and the Amo Products offer quizzes that reinforce the impression that the product will provide the user with personalized results; the PDF Products allow the user to upload and edit a document.

47. *Third*, Defendants' payment pages divert attention from references to auto-renewing subscriptions or recurring charges. The pages create the impression of a low-cost, low-risk transaction by falsely representing that consumers are making a one-time payment and advertising money-back guarantees. At the same time, Defendants fail to disclose material terms clearly and conspicuously, consistently relegating terms to the smallest print on the page—or even omitting key terms entirely.

48. *Fourth*, in many cases, Defendants make unauthorized charges even beyond the undisclosed subscription fees, by double-charging consumers for the same product or by adding more products to the transaction without consumers' knowledge or consent.

49. *Finally*, Defendants fail to provide simple mechanisms to stop recurring charges. To the contrary, Defendants make cancellation unduly difficult, for example, by omitting cancellation options from their websites and apps or requiring consumers to explain why they want to cancel. Even after confirming cancellation, Defendants often continue charging or attempting to charge users without authorization. Defendants also refuse to honor their money-back guarantees.

50. Frequent consumer complaints and warnings from third-party service providers put Defendants on notice that their business practices were misleading and unlawful.

51. Rather than fixing their business practices in response to these warnings, Defendants churn out new and deceptive products, continually register new companies, and open fresh merchant accounts to avoid fraud monitoring programs. The result is an ever-evolving web of Cyprus and Delaware shell companies that allows Defendants to continue bilking U.S. consumers out of tens of millions of dollars and routing their ill-gotten gains overseas.

### A. Wisey

52. Since early 2023 and continuing to the present, Universe Group and Wisey Defendants have marketed and sold Wisey, an online program that purports to diagnose and treat ADHD symptoms.

53. Many consumers report that Wisey charged them for services they never intended to purchase, imposed duplicate or recurring charges, and ignored their requests for refunds or cancellations.

54. **Ads.** Wisey is advertised on third-party websites and social media, grabbing consumers' attention with copy like "Secret tool to crack the ADHD code" and "How rare is your ADHD type?"

55. **Landing page.** Clicking on a Wisey ad directs users to take a quiz on its website, Wisey's landing page. *See* Att. B, Fig. A.1.[3]



[3] For ease of reference, images from the Wisey purchase flow are reproduced here. Captures from the purchase flows for all products referenced in this Complaint can be found in Attachment B to this Complaint.

COMPLAINT

CASE NO. 26-CV-5232                                         - 16-

56. The quiz asks questions such as "How often are you distracted by activity or noise around you?" and "Have you been in bad situations because of ADHD-like symptoms?" The questions are interspersed with slides of encouragement and marketing claims about Wisey's plan. *See* Att. B, Fig. A.2.



57. Regardless of the user's answers, the quiz results invariably report that the user struggles at least to some extent with ADHD. For example, if a user indicates no symptoms, the website will nevertheless tell them that they have low-level ADHD, and their life satisfaction and self-confidence are below average. *See* Att. B, Fig. A.3.



58. After presenting these results, Wisey prompts the user to enter their email address to receive a "personal ADHD Management plan." Once the user enters their name and email

address, the website announces that their "4-week ADHD Management Plan is ready!" *See* Att. B, Fig. A.4. Wisey then predicts that the user will attain the "[l]ife you wanted" by following Wisey's plan for 30 days. *See* Att. B, Fig. A.5.



59.    **Payment pages.** After the user clicks "Continue," the next screen displays a 10-minute countdown timer, creating a sense of urgency, alongside a large button labeled "GET MY PLAN." Further down, the page includes claims such as "83% of our users were able to manage their ADHD in 30 days" and purported testimonials like "SO MANY USEFUL INFO!" and "[Wisey] boosted my confidence o the [sic] unseen levels."

60.    If the user hesitates, a pop-up invites them to spin a wheel for an extra discount. The wheel consistently offers the largest possible discount—67% off—and engaging the wheel

resets the countdown timer. This creates the impression that the user must act quickly to secure the offered discount.

61. Clicking the "GET MY PLAN" button scrolls the user to three options: a 3-month plan, a 1-month plan, and a 6-month plan. Each plan is listed alongside a calculated daily price, in each case under $1 per day. The one-month plan, labeled "MOST POPULAR," is pre-selected and highlighted in purple. Beneath these options is a larger "GET MY PLAN" button that is flashing. *See* Att. B, Fig. A.6 (cropped below for visibility).



62. This page also contains a 30-day money-back guarantee claim in bold font just above the "GET MY PLAN" button.

63. Beneath the larger "GET MY PLAN" button, in the smallest text on the page, the following text appears in gray font on a gray background:

To avoid any disruption, you agree that the 1-month subscription trial plan for $19.99 you selected will automatically be extended at the full price for successive renewal periods and you will be charged $59.99 every month. You can cancel your subscription by contacting our customer support team by email at support@wisey.app.

64.     The purported disclosure in fine print is neither clear nor conspicuous. Not only is it difficult to see, especially in comparison to the larger, more colorful, and higher contrast elements above, but it is also inconsistent with other messaging suggesting that the user is purchasing a single plan for the specified time period.

65.     The fine print includes a hyperlink to Wisey's Subscription Policy, which states: "Unless you cancel at least 24 hours before the end of the trial, you will be automatically charged a price indicated on the payment screen for a chosen subscription period." The Subscription Policy also states that users can "cancel a trial or a subscription via settings in your account or by contacting our support."

66.     To the extent consumers notice the hyperlink to Wisey's Subscription Policy, they would have no reason to click on it.

67.     Clicking the large "GET MY PLAN" button brings up a payment form overlay showing the total price for the selected plan period. Users can pay via PayPal or credit/debit card. This form does not disclose the auto-renewing subscription. *See* Att. B, Fig. A.7.



68.     **Upsells.** After payment, Wisey offers an add-on subscription for an e-book, advertised as "$17.99 only!" with "SAVE 60%" next to a crossed-out price of "USD 45.00." In

smaller gray text, which is not clear or conspicuous, Wisey purports to disclose: "$17.99 for the 1st month, then $45.00/month." If the user scrolls lower on the screen, which is reproduced below, Wisey offers a further discount for the same product—"$9.99 only!"—with a flashing "SAVE 78%" button. *See* Att. B, Fig. A.8.



69.     Below this, in small gray text, which is not clear or conspicuous, Wisey states:

> By continuing you agree that if you don't cancel at least 24 hours prior to the end of the 1-month introductory period, you will automatically be charged the full price of $45.00 every month until you cancel at Settings. Learn more about cancellation and refund policy in <u>Subscription Policy</u>.

70.     Finally, the website prompts the user to create an account with their email address and a password to access Wisey.

71.     Once the user is signed in, the Wisey dashboard displays a large advertisement for another upsell, a "Memory training simulator." *See* Att. B, Fig. A.9. The ad contains two

buttons—"More details" and "Unlock Training." Consumers who click the "Unlock Training" button are charged another fee without their knowledge or consent.



72. On their dashboard, the user is able to access Wisey's library of courses, several dozen videos and text articles, such as "Learn & Grow. Self-Improvement," "Negotiating for the Best Outcome," and "Self-Esteem & Procrastination." Contrary to Wisey's advertising claims, the course content is not personalized in any way, and none of the materials even mention ADHD.

73. Many users, upon realizing the content is not what they expected, close the site believing they made a single one-time purchase. Later, they discover recurring charges of $59.99 or more and additional charges for undisclosed upsells.

74. **Cancellation and refunds.** Wisey's Subscription Policy and money-back guarantee notwithstanding, consumers encounter significant obstacles to cancellation and obtaining refunds. Wisey does not provide simple mechanisms to stop recurring charges. There is no option to cancel in the user's account settings. Customer support often ignores users' emails or responds by requiring them to justify their decision to cancel.

75. Wisey continues billing some consumers even after Wisey customer support confirms successful cancellation of their accounts.

76. From January 2023 to August 2025, Wisey brought in over $15.4 million from U.S. consumers through PayPal.

### B. PDF Products

77. Since May 2024 and continuing to the present, Universe Group and PDF Defendants have marketed and sold two online PDF editing products, PDF Guru and PDF Master, which are largely identical in functionality and consumer-facing flow.

78. **Ads.** Consumers often encounter ads for the PDF Products on search engines and social media. Many of these ads represent that the products are free to use. *See* Att. B, Fig. B.1.

79. **Landing page.** When consumers click on sponsored search results or advertisements for PDF Guru, they are taken to a landing page that immediately prompts the user to upload the PDF they wish to edit. No price information is disclosed. *See* Att. B, Fig. B.2.

80. After the file is uploaded, the website redirects the consumer to a page that presents standard editing tools and permits the consumer to edit the uploaded file. No price disclosures appear on this screen.

81. After clicking "Done" or "Download," a pop-up appears prompting the user to select a file format and enter their email address. *See* Att. B, Figs. B.3–B.4.

82. **Payment pages.** After entering their email address, consumers encounter a price for the first time. A page appears indicating that payment is required to access or retrieve the edited PDF. The download/payment interface prominently displays a nominal one-time price (e.g., $0.99 or $1.99) for seven-day access. *See* Att. B, Fig. B.5.

83. The fine print below the primary content of the page states:

> After 7 days, you will be charged $49.99/month unless you cancel 24 hours before the trial ends. To access your first document for free please click here. See our Subscription terms for details on cancellation and refunds. We provide refunds in accordance with our Refund Policy.

84. This disclosure is not clear and conspicuous. On the download page, the fine print appears in small, gray text on a gray background, below larger and more colorful design elements and payment prompts. Depending on the dimensions of the user's screen, the fine print might appear below the fold; that is, the user would have to scroll down to see it. In that case, the user could click the large, purple "Continue" button at the top of the page and proceed to the payment page without the fine print ever appearing on their screen. *Id.*

85. The payment page repeats the fine print language below colorful "Express checkout" fields and other payment options. *See* Att. B, Fig. B.6.

86. The fine print contradicts Defendants' prior misrepresentations that PDF Guru charges only a nominal one-time fee to download a single document.

87. After providing payment information, consumers frequently find that the output is not as expected or not usable—for example, the file cannot be opened or the file size is unchanged after going through the "compression" tool.

88. Consumers often move on after completing the task or concluding the output is not satisfactory, and only later find additional charges from PDF Guru on their credit card or PayPal statements. Defendants often do not send subscription confirmations, advance notices of renewal, or instructions for how to cancel before subsequent charges occur.

89. **Cancellation and refunds.** Upon discovering that PDF Guru has surreptitiously enrolled them in a costly recurring subscription, consumers who try to cancel using PDF Guru's website often run into difficulties. For some consumers, the cancellation feature on the website is non-functional; others are unable to locate a cancellation feature at all. Supposed "24/7" support is often unresponsive.

90. If consumers are able to reach support representatives, they frequently deny refunds and continue billing consumers even after promising to cancel their subscriptions.

91. At times, PDF Guru's systems have initiated charges even after customer service representatives informed consumers that no active subscription existed and that they would reverse attempted charges. PDF Guru has billed some consumers multiple times in the same billing period.

92. Universe Group and PDF Defendants also offer PDF Master, which consumers encounter through similar or identical advertisements and online flows. Consumers report substantially the same experience with PDF Master as with PDF Guru: they see advertisements promising free or nominal pricing, use the software before becoming aware of any cost, and are surprised by subsequent recurring charges.

93. From March 2023 to August 2025, the PDF Products collectively brought in over $6.5 million from U.S. consumers through PayPal.

### C. Lumi

94. Since September 2022 and continuing to the present, Universe Group and Lumi Defendants have marketed and sold Lumi, an online fashion consulting service operating through multiple domains, including tailored-box.com, lumi.mybeauty.place, and agelessbox.place, and available on the Apple App Store as "Lumi: styling & shopping."

95. **Ads.** Lumi attracts consumers through social media ads and quizzes promising personalized fashion advice. The checkout process uses pop-ups and countdown timers to push users into payment screens where subscription terms are hidden in fine print, causing consumers to enroll without understanding the terms of the offer. Consumers report being billed before their trial periods ended, charged for services they never agreed to, and even double-billed on the same day. When consumers attempt to cancel, they are met with technical errors, inaccessible account settings, and unanswered emails or calls, leaving them paying for undesired recurring charges. Many consumer complaints describe Lumi's customer service as unresponsive or evasive.

96. Lumi promotes its service through social media advertisements featuring interactive fashion quizzes with statements such as "define your unique style," "discover what truly suits you," and "ready-to-shop personalized looks." These ads promise that the quiz will analyze personal style and deliver customized outfit recommendations via email or app.

97. **Landing page.** The purchase flow begins with a quiz that collects demographic information (e.g., age, height, weight, gender) and asks about the user's fashion preferences (e.g., favorite colors, lifestyle, and budget). *See* Att. B, Figs. C.1–C.2.

98. After completing the quiz, the user sees progress bars indicating that Lumi is analyzing their profile, style, and lifestyle, reinforcing the impression that Lumi will provide personalized recommendations at the end of the quiz. *See* Att. B, Fig. C.3.

99. The user is then prompted to "Enter the Email to Get Your *Weekly Outfit Selections*." *See* Att. B, Fig. C.4.

100. **Payment pages.** After the quiz, the user encounters an "EXCLUSIVE DISCOUNT" offer with one button: "CLAIM MY EXCLUSIVE DISCOUNT." Clicking on this button brings up a page with a 10-minute countdown timer and a "GET MY OUTFITS" button. *See* Att. B, Figs. C.5–C.6. Clicking the "GET MY OUTFITS" button automatically opens a payment page with a single price and options to pay with either PayPal or credit/debit card. *See* Att. B, Fig. C.7. No mention of a subscription appears on this pop-up.

101. Because the payment page appears automatically, consumers can enter payment information without subscription terms ever appearing on their screen.

102. If the user closes the first pop-up, another pop-up appears offering another discount. The user must close both windows to view the full pricing page.

103. When the user returns to the full pricing page, the pricing options are laid out under the heading, "Your Stylist-Curated Outfits Are Just *One Click Away*," followed by calculated daily prices for 1-week, 4-week, and 12-week plans. *See* Att. B, Fig. C.8.

104. Some versions of the purchase flow also include a 30-day money-back guarantee.

105. Below the "GET MY OUTFITS" button, the following subscription terms appear in smaller text:

> By continuing you agree to be billed **USD 19.99 for the first 28 days**. If you don't cancel at least 24 hours prior to **[date]**, you will automatically be charged the full price of **USD 39.99 on a 4-week basis** until you cancel in your account settings. Learn more about cancellation and refund policy in <u>Subscription Terms</u>. The charge will appear on your bill as lumi.beautybox.fyi.

*See* Att. B, Fig. C.8. These terms are not clear and conspicuous. Consumers cannot see these terms without scrolling past the "GET MY OUTFITS" button, nor is such scrolling necessary to complete the transaction. Moreover, the "28 days" period is misleading because consumers are automatically charged a higher price after *27* days, due to the 24-hour cancellation requirement.

106. Lumi frequently bills consumers for the recurring subscriptions even before the end of the plan term.

107. Once consumers complete the transaction, they often find that the app does not work, or there are no stylists available during the term of their plan.

108. **Upsells.** After users have already paid for the base subscription, Lumi adds further charges for undisclosed upsells made to look like a confirmation step for the original purchase or appearing as a free add-on, such as a "hairstyle guide" or "wardrobe essentials voucher."

109. **Cancellation and refunds.** Consumers who attempt to cancel encounter technical blocks or discover there is no cancellation option in the app or website. Emails and calls to Lumi customer service also go unanswered.

110. Often, consumers find that the only way to capture Lumi's attention is by disputing their transactions through PayPal. When consumers dispute their transactions through PayPal, Lumi sometimes offers consumers refunds in exchange for canceling their disputes with PayPal, telling them: "Kindly note that the dispute process may take up to 20 days. However, if you cancel the dispute in PayPal, we are committed to processing a refund instantly and you will receive your funds within 72 hours." This strategy reduces Lumi's dispute rates, making PayPal less likely to flag Lumi's accounts for fraud and impose account limitations. Lumi frequently continues to refuse refunds even after the PayPal disputes are closed.

111. Even when consumers supposedly succeed in canceling, Lumi often continues to debit their financial accounts.

112. From December 2023 to June 2025, Lumi brought in over $14.1 million from U.S. consumers through PayPal.

### D. Nebula

113. Since at least August 2020 and continuing to the present, Nebula Defendants have sold various astrology- and spirituality-themed websites and mobile apps under the Nebula banner, such as horoscopes, tarot readings, birth charts, palm readings, and live "psychic chats." The Nebula product line includes multiple websites, including asknebula.com, nebula-horoscope.com, and nebula-witch-power.com, as well as a mobile app for Android and iOS titled "Nebula: Horoscope & Astrology."

114. **Ads.** Consumers typically encounter Nebula via social media advertisements and sponsored search engine results that promote "$1 horoscope," "free birth chart," or similar low-cost offers accompanied by zodiac imagery. These ads funnel users to Nebula domains or

app-store listings, where the offer is framed as a quick "trial" or one-off horoscope or psychic reading, but in fact is tied to a recurring subscription.

115. **Landing page.** Clicking a Nebula advertisement takes the user to one of Nebula's websites, which invites the user to take a quiz. *See* Att. B, Fig. D.1. The quiz asks questions such as, "Do you feel your energy influences men?" and "Are there intuitively powerful women in your lineage?" The quiz may also ask the user to upload a photo of their hand for a palm reading. *See* Att. B, Fig. D.2.

116. The website then shows an animation while it supposedly analyzes the photo, claiming that it is "preparing a detailed palm reading crafted exclusively for you," which will "reveal your dominant type of archetype energy." *See* Att. B, Fig. D.3.

117. **Payment pages.** At the conclusion of the quiz, Nebula prompts the user to choose among several "trial prices," claiming that: "While the actual cost to us is $13.67*, we encourage you to select an amount you find comfortable for you." *See* Att. B, Fig. D.4. This "name-your-price" presentation reinforces the impression of a one-off payment. Meanwhile, it conceals a negative-option feature that continues billing unless the consumer cancels.

118. After the user selects a price (e.g., $5), Nebula presents a purchase page offering a "Personalized reading for" that price. *See* Att. B, Fig. D.5. The page includes a 10-minute countdown timer and two flashing purple "GET MY RESULTS" buttons, which convey urgency. While these elements are large, colorful, and bolded, crucial subscription terms are buried in the fine print:

> You are enrolling in monthly subscription to NEBULA service. By clicking "Get my reading", you agree that if you don't cancel prior to the end of the **7-day trial** for **$5** you will automatically be charged **$45** every **30 days** until you cancel in settings. The charge will appear on your bill as **NEBULA**. Learn more about cancellation and refund policy in **Subscription policy**.

119. This fine-print disclosure of the Nebula subscription is not clear: it directly conflicts with the representations above and on the previous page that a consumer can obtain a single reading for the price they chose. Nor is the disclosure conspicuous: it is difficult to see, especially in comparison to the more prominent elements on the page.

120. When the user clicks "GET MY RESULTS," Nebula displays a payment form that mentions only the payment amount the consumer chose, stating, for example, "You will be charged only $5"—without any mention of a subscription or recurring fee. *See* Att. B, Fig. D.6. This representation affirms consumers' belief that they are making a one-time purchase.

121. Nebula accepts payment via PayPal, as well as credit and debit cards.

122. Nebula's hidden disclosures and misleading pricing representations deceive consumers into giving Nebula their payment information for a small, one-time purchase.

123. In some cases, Nebula's billing practices conflict even with its fine-print disclosures. Nebula has charged consumers both the nominal "trial" fee and the first subscription fee at the same time.

124. After completing payment, consumers often receive access to generic astrology content rather than the promised personalized reading.

125. **Upsells.** Despite not providing the initial reading, Nebula's website then encourages users to make additional payments for "credits" that can be redeemed for more quizzes and to chat online with psychics.

126. Consumers frequently discover recurring charges weeks or months later, often after multiple billing cycles.

127. **Cancellation and refunds.** Consumers who attempt to cancel run into significant obstacles. Nebula's fine print instructs users to cancel in account settings, but many consumers find that the websites and apps lack a functional cancellation option.

128. When consumers attempt to cancel by emailing customer support, Nebula often ignores them or delays in responding, repeatedly charging the consumer in the meantime.

129. Even in instances when Nebula confirms cancellation, it often continues billing consumers.

130. From January 2023 to June 2025, Nebula brought in over $37.4 million from U.S. consumers through PayPal.

### E. Amo Products

131.     Since at least May 2020 and continuing to the present, Amo Defendants have marketed and sold fitness and nutrition apps, including the Amo Products, available on the Apple App Store and Google Play as MadMuscles: Workouts & Diet; Harna: Workout & Fitness; and Unimeal: Fasting and Diet.

132.     These apps attract consumers with promises of personalized fitness and nutrition plans, but fail to deliver on those promises and rely on deceptive advertising. Subscription terms are buried in fine print, while countdown timers and "biggest discount" pop-ups create false urgency and draw attention away from any disclosures. Defendants use upsell screens to deceive users into adding extra paid services without their consent. After the initial payment, Defendants impose recurring charges on consumers that they never agreed to, as well as duplicate transactions and additional fees for hidden add-ons. When consumers try to cancel, they are met with cancellation paths that do not work, offers of free months instead of cancellation, and unresponsive customer support.

133.     **Ads.** The Amo Products differ from one another in content and target audience, but follow substantially the same advertising approach. MadMuscles primarily targets men for muscle building, weight loss, and general fitness; Harna offers menstrual cycle-synced yoga, pilates, and strength training for women; and Unimeal focuses on nutrition, including intermittent fasting schedules, diet plans, and recipes.

134.     As an example, MadMuscles ads promise workout plans purportedly tailored to the user's current fitness and goals, such as a 30-day beginner home workout plan, a 28-day calisthenics challenge, and a program for men over 50.

135.     **Landing page.** Figures E.1–E.13 in Attachment B show the flow after a user clicks an ad for a tai chi program. Clicking the ad takes the user to a quiz that asks about the user's age, gender, and weight, as well as workout experience, health concerns, and fitness goals. *See* Att. B, Fig. E.1. The MadMuscles quiz questions are interspersed with motivational images. *See* Att. B, Fig. E.2.

136. After the quiz, the website shows a loading bar with the caption "Suggesting workout program," before announcing that the user's "personalized Tai Chi plan is ready!" *See* Att. B, Figs. E.3–E.4.

137. On the next screen, MadMuscles displays a "Personal summary based on your answers." *See* Att. B, Fig. E.5. Lower on the page, MadMuscles promises a "Tai Chi program tailored to your age, body type, and wellness goals." *See* Att. B, Fig. E.6.

138. **Payment pages.** If the user clicks the orange "Get my plan" button, the page scrolls to pricing showing calculated daily prices (each less than $1 per day) for a 1-week trial, 4-week plan, and 12-week plan.

139. Shortly after the user arrives on the pricing page, a discount wheel overlay pops up, which consistently lands on the "biggest extra discount." *See* Att. B, Fig. E.7.

140. When the user closes the pop-up, the displayed prices are reduced, and a 10-minute countdown timer appears in the upper left, creating urgency. *See* Att. B, Fig. E.8.

141. Beneath this pricing information and below the fold, in the smallest text on the page, the fine print reads:

> By continuing, you agree that your subscription will be auto-renewed at the full price of 39.99 USD each month at the end of the month intro period unless you cancel in Settings. Please see our Subscription terms, Refund policy.

*See* Att. B, Fig. E.9.

142. Clicking "Continue" takes the user to a payment form showing the total price for the selected term (e.g., $15.19 for a 4-week plan, as shown in Attachment A, Fig. E.10). MadMuscles accepts payment via PayPal as well as credit and debit cards, Google Pay, and Apple Pay. The payment form does not mention the auto-renewing subscription.

143. Using these hidden subscription terms, Defendants have tricked hundreds of thousands of consumers into believing they were buying one plan for the displayed price, then charged them recurring subscription fees they did not expect.

144. **Upsells.** After the user enters their payment information for the base plan, MadMuscles presents a barrage of upsells. In the example in Attachment A, the website offers a "Personal Meal Plan." *See* Att. B, Fig. E.11. The "Add to my program" button appears in bright

orange against a dark background, while the close control is a small, hard-to-find gray "X" in the pop-up's upper right.

145. Believing they have already completed their purchase, users can easily click the "Add to my program" button by mistake. There is no additional confirmation step before MadMuscles enrolls the user in, and charges them for, a second subscription. Consequently, consumers frequently discover from their financial statements that they were charged for an upsell without their knowledge or consent.

146. If the user is able to find the close button and reject the offer, another pop-up urges reconsideration with an "additional 20% discount." *See* Att. B, Fig. E.12. Closing that pop-up returns to the "Personal Meal Plan" upsell at a lower price, again requiring the user to find and click the small gray "X" to reject it. *See* Att. B, Fig. E.13.

147. In the example in Attachment B, MadMuscles presents another offer after the meal plan upsell—this one called a "5-in-1 pack." *See* Att. B, Fig. E.14. That screen contains no pricing terms. In fact, the "5-in-1 pack" is another recurring subscription, for dietary supplements, with monthly prices ranging approximately $30–$90.

148. Surprise duplicate and upsell charges are also common with Harna and Unimeal, with multiple debits often appearing on consumers' accounts on the same day.

149. After purchasing and trying the programs, consumers frequently find that the plan is not personalized. Instead, the content is generic and sometimes contradictory to the user's stated preferences—for example, recommending meat-based meal plans to vegan users. Others complain that they were never able to use the products at all.

150. **Cancellation and refunds.** When consumers attempt to cancel, they are often unable to find the cancellation feature or the feature does not work.

151. Customer service may ignore consumers entirely, or engage them in ongoing back and forth with automated messages.

152. Numerous consumers report Defendants continued billing them even after they had canceled or received assurances from customer support.

153. From January 2023 to June 2025, the Amo Products collectively brought in over $32.7 million from U.S. consumers through PayPal.

154. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things, Defendants engaged in their unlawful conduct repeatedly over many years and continue to participate in their unlawful and deceptive subscription scheme despite knowledge of consumer complaints and warnings from third-party service providers.

## VIOLATIONS OF THE FTC ACT

155. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

156. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

157. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### Count I: Failure to Disclose Material Terms of Offer

158. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of their products, Defendants represent, directly or indirectly, expressly or by implication, that consumers can obtain a limited-term use of Defendants' products for free or a nominal one-time payment.

159. In numerous instances in which Defendants make the representation set forth in Paragraph 158 of this Complaint, Defendants fail to disclose, or to disclose adequately to consumers, material terms and conditions in their offer, including: that Defendants will enroll consumers in a recurring subscription upon payment; that consumers must cancel their subscription within a certain time, often at least 24 hours before the end of the trial period, to

avoid recurring charges; the cost of recurring charges; and the terms of Defendants' refund policies. These facts would be material to consumers in deciding to purchase the products.

160. In light of the representation described in Paragraph 158, Defendants' failure to disclose, or to disclose adequately, the material information as set forth in Paragraph 159 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II: Unfairly Charging Consumers Without Authorization

161. In numerous instances, Defendants have charged consumers without their authorization, including by charging consumers for undisclosed subscriptions, double-billing consumers for the same purchase, or charging consumers for unauthorized add-on purchases. Consumers were unaware of these unauthorized charges, and thus unable to prevent them. Defendants often refused to refund consumers the full amount of the unauthorized charges.

162. Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

163. Therefore, Defendants' acts or practices as described in Paragraph 161 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

### **VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

164. In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401–05, which became effective on December 29, 2010. Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." 15 U.S.C. § 8401.

165. Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller: (a) clearly and conspicuously discloses all material terms of the

transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides simple mechanisms to stop recurring charges. *See* 15 U.S.C. § 8403.

166. The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

167. As described above, Defendants advertise and sell Defendants' subscription products through a negative option feature as defined by the TSR, 16 C.F.R. § 310.2(w).

168. Pursuant to Section 5(a) of ROSCA, 15 U.S.C. § 8404(a), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA is treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, and therefore a violation of ROSCA constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

169. For each violation of ROSCA, Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes the Court to grant relief as it finds necessary to redress injury to consumers, including monetary relief, rescission or reformation of contracts, the refund of money or return of property, and public notification respecting the rule violation or the unfair or deceptive act or practice.

### Count III: Failure to Clearly and Conspicuously Disclose Material Terms

170. In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, Defendants have failed to clearly and conspicuously disclose all material terms of the transaction, including that Defendants will automatically enroll consumers in a negative option plan with additional charges, the amount of the additional charges, and the frequency and timing of recurring charges, before obtaining the consumer's billing information.

171. Defendants' acts or practices as set forth in Paragraph 170 are violations of Section 4(1) of ROSCA, 15 U.S.C. § 8403(1), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count IV: Failure to Obtain Express Informed Consent**

172. In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, Defendants have failed to obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction.

173. Defendants' acts or practices as set forth in Paragraph 172 are violations of Section 4(2) of ROSCA, 15 U.S.C. § 8403(2), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count V: Failure to Provide Simple Mechanisms for Cancellation**

174. In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, Defendants have failed to provide simple mechanisms to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

175. Defendants' acts and practices as set forth in Paragraph 174 are violations of Section 4(3) of ROSCA, 15 U.S.C. § 8403(3), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

176. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and ROSCA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act and ROSCA by Defendants;

B. Award Plaintiff such temporary and preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action

and to preserve the possibility of effective final relief, including but not limited to temporary and preliminary injunctions, and an order freezing assets;

C.      Award such monetary relief and other relief within the Court's power to grant; and

D.      Award any additional relief as the Court determines to be just and proper.

Dated: June 2, 2026                              Respectfully submitted,

*/s/ Alyssa J. Wu*
Alyssa J. Wu
Shining J. Hsu
Joshua A. Doan
Federal Trade Commission
Western Region San Francisco
90 Seventh St., Suite 14-300
San Francisco, CA 94103
Phone: (415) 848-5100
Email: awu1@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

# ATTACHMENT A



**Genesis Tech enterprise structure**: Cyprus Corporate Defendants are shown in green, Delaware Corporate Defendants are shown in blue, and products are shown in yellow. Lines terminating in filled dots indicate corporate ownership.

**Genesis Tech**
Vladimir Mnogoletny (Founder/CEO)
Vasili Ulianov (Founder/CEO)

**Other Subsidiaries & Products**

**Universe Group**
Stamatis Skianis (Director)

**Koflimin**
Stamatis Skianis (Director)

**Growthmind Labs**
Oksana Kucher (Owner)

**Wisey**
ADHD

**Lopofist**
Stamatis Skianis (Director)

**Gurudocs**
Iryna Oleksyn (Owner)

**PDF Products**
Document Editing

**Bramol VPN MobApps**
Stamatis Skianis (Director)

**Evertech**
Olga Garbuzenko (Owner)

**Lumi**
Fashion

**Obrio GM Unicorn**
Stamatis Skianis (Director)

**Spiritual Nebula**
Stamatis Skianis (Director)

**Nebula**
Horoscopes & Psychics

**Yolo Brothers**
Rostyslav Ivanitsa (CEO)

**AMO**
Stamatis Skianis (Director)

**Amoapps**
Stamatis Skianis (Director)

**AmoApp**
Viktoriia Savchuk (CEO)

**Amo Products**
Fitness & Diet

# ATTACHMENT B

## A. Wisey Purchase Flow, Captured October 8, 2024



*Figure A.1*



*Figure A.2*



*Figure A.3*



*Figure A.4*



*Figure A.5*



*Figure A.6*



*Figure A.7*



*Figure A.8*



*Figure A.9*

## B. PDF Guru Purchase Flow, Captured January 12, 2026



*Figure B.1*



*Figure B.2*



*Figure B.3*



*Figure B.4*



*Figure B.5*



*Figure B.6*

## C.     Lumi Purchase Flow, Captured September 4, 2025



*Figure C.1*

*Figure C.2*



*Figure C.3*



*Figure C.4*



*Figure C.5*



*Figure C.6*



*Figure C.7*



*Figure C.8*

## D. Nebula Purchase Flow, Captured September 4, 2025



*Figure D.1*

*Figure D.2*



*Figure D.3*



*Figure D.4*



*Figure D.5*



*Figure D.6*

# E.    MadMuscles Purchase Flow, Captured December 22, 2025



*Figure E.1*



*Figure E.2*



*Figure E.3*



*Figure E.4*



*Figure E.5*



*Figure E.6*



*Figure E.7*



*Figure E.8*



*Figure E.9*



*Figure E.10*



*Figure E.11*



*Figure E.12*



*Figure E.13*



*Figure E.14*